Matter of Stephanie R. v Walter Q. (2022 NY Slip Op 02042)





Matter of Stephanie R. v Walter Q.


2022 NY Slip Op 02042


Decided on March 24, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:March 24, 2022

528244
[*1]In the Matter of Stephanie R., Respondent,
v
Walter Q., Appellant. (And Two Other Related Proceedings.)

Calendar Date:January 6, 2022

Before:Garry, P.J., Clark, Aarons and Colangelo, JJ.

John A. Cirando, Syracuse, for appellant, and appellant pro se.
Thaler & Thaler, PC, Ithaca (Thomas D. Cramer of counsel), for respondent.
Andrea Mooney, Ithaca, attorney for the child.



Colangelo, J.
Appeal from an order of the Family Court of Tompkins County (Cassidy, J.), entered July 10, 2018, which, among other things, granted petitioner's application, in a proceeding pursuant to Family Ct Act article 6, for custody of the parties' child.
Petitioner (hereinafter the mother) and respondent (hereinafter the father) are the parents of a child (born in 2014). In April 2017, the mother filed petitions for custody and for an order of protection against the father based upon his alleged commission of various family offenses. Family Court issued a temporary order of custody that included a temporary order of protection in the mother's favor. Thereafter, the father moved for, among other relief, joint temporary custody of the child with an equal visitation schedule. The mother cross-moved for supervised visitation. Family Court ordered an investigation and report by the local social services agency (see Family Ct Act § 1034), after which the father's visitation was suspended.[FN1] The father thereafter moved to resume visitation and, by order entered in August 2017, the court granted him supervised visitation and awarded the mother temporary sole legal custody and primary placement of the child.
Following a lengthy fact-finding hearing, Family Court sustained the mother's amended family offense and custody petitions, finding that the father committed the family offenses of sexual misconduct, harassment and menacing, and issued an order of protection in favor of the mother. Family Court granted visitation to the father on a graduated basis, to begin as supervised until he completes the first stage of a domestic batterer's program. The father appeals, and we affirm.
The father contends that Family Court erred in sustaining the mother's family offense petition. "Whether a family offense has been committed is a factual issue to be resolved by Family Court, and its determinations regarding the credibility of witnesses are entitled to great weight on appeal" (Matter of Paul Y. v Patricia Z., 190 AD3d 1038, 1042 [2021] [internal quotation marks and citations omitted]; see Matter of Allen v Emery, 187 AD3d 1339, 1340 [2020]). "To prevail on her family offense petition, [the mother] bore the burden of establishing, by a fair preponderance of the evidence, that [the father] committed one of the enumerated family offenses set forth in Family Ct Act § 821 (1) (a)" (Matter of Allen v Emery, 187 AD3d at 1339 [citation omitted]; see Family Ct Act § 832).
The mother described a series of violent and controlling acts by the father, occurring over a period of several years. She testified that the father frequently deprived her of sleep with relentless yelling throughout the night, alienated her from family and friends, controlled her activities and finances, removed or destroyed her personal and work property, threatened to take the child from her permanently and threatened to sexually assault her. More specifically, she testified that the father consistently [*2]interfered with her communication with the maternal grandmother, prevented her from fraternizing with her colleagues outside of working hours, refused to allow her to attend her graduation ceremony, insisted on driving her to and from work, recorded her telephone conversations and used spyware to obtain her computer passwords. The mother also testified that she did not feel safe in the marital residence but was physically prevented from leaving; the father would grab her hard, carry her back to the house and one time he knocked her into a cabinet. The mother further testified that the father canceled her bank account and left her a limited amount of money. He repeatedly disrupted the mother's workday with multiple text messages and calls, during which he screamed obscenities at her, called her names and threatened to take the child out of state.
According to the mother, she and the child sometimes stayed in a hotel because she felt unsafe in the house and needed relief from the father's constant arguing. The father would then call her repeatedly and sometimes track her down, frightening her and the child; he once took the child from her. The mother testified to an incident in which the father blocked her exit from a hotel room, grabbed her by her hair and threw her onto the bed. The mother also testified that the father became increasingly aggressive in demanding sexual relations. One time when they were in a vehicle and the child was awake in the back seat, the father pulled the car over and forced himself on her, despite her protestations. The mother recounted in detail two incidents of forcible sexual assault by the father.
The mother testified that the father exposed her and the child to danger. During a road trip with the child awake in the back seat, the father "floored the car," drove into the other lane and he said that he "might as well just kill all of [them]." She described another incident where the father opened the passenger door of their moving car, jumped out and rolled to the shoulder of the road. Sometimes when the mother put the child in the vehicle, the father became loud and jumped into the car so that she could not leave, causing the child to scream.
The mother's account of events was corroborated by the maternal grandmother. Specifically, the maternal grandmother testified that, although they had two vehicles, the father drove the mother to and from school and she never observed the mother being able to leave the house alone. She described that in the middle of the night the father would yell and scream at the mother, go downstairs for a while, then return and repeat the verbal haranguing. The maternal grandmother heard the father call the mother names and tell her that "she was never going to see [the child] again."
The father did not deny that the parties engaged in sexual encounters during the time periods mentioned by the mother and acknowledged that the sexual contact was for the purpose of sexual [*3]gratification. However, he denied that he used forcible compulsion during their encounters and claimed that all sexual acts between them were consensual. He testified that the mother was lying about all her allegations.
As Family Court found, the testimony provided by the mother and the maternal grandmother was in sharp contrast to that of the father. According deference to Family Court's credibility determinations, which are supported by our review of the record, we find that the proof was sufficient to establish, by a fair preponderance of the evidence, that the father twice committed the family offense of sexual misconduct (see Penal Law § 130.20; Family Ct Act § 821 [1] [a]). We reach the same conclusion with respect to the family offenses of harassment in the first and second degrees. Specifically, we find that the father's behavior — screaming at the mother, insulting her with degrading names, barring her exit from the house or a particular room, intentionally placing the mother and the child in fear of imminent physical injury, monitoring her movements and telephone calls and threatening to take the child away from her permanently — established that he "engag[ed] in a course of conduct or repeatedly committ[ed] acts which place[d] [the mother] in reasonable fear of physical injury" (Penal Law § 240.25; see Family Ct Act § 821 [1] [a]) and "which alarm[ed] or seriously annoy[ed] [the mother] and which serve[d] no legitimate purpose" (Penal Law § 240.26 [3]; see Family Ct Act § 821 [1] [a]; Matter of Allen v Emery, 187 AD3d at 1341).
The father also contends that Family Court erred in its custody award and allowing him only supervised visitation until he completes the first stage of a batterer's program. "The dispositive inquiry in an initial custody determination is the best interests of the child, which requires an evaluation of various factors, such as each parent's past performance, fitness and ability to maintain a stable home environment and provide for the child's overall well-being, as well as the parents' respective willingness to foster a positive relationship between the child and the other parent" (Matter of Megan UU. v Phillip UU., 193 AD3d 1287, 1288 [2021] [citations omitted]; see Eschbach v Eschbach, 56 NY2d 167, 171 [1982]; Matter of Shirreece AA. v Matthew BB., 195 AD3d 1085, 1087 [2021]). Because the mother proved by a preponderance of the evidence that the father committed acts of domestic violence, Family Court was obligated to "consider the effect of such domestic violence" when conducting its best interests analysis (Domestic Relations Law § 240 [1] [a]; see Matter of Chris X. v Jeanette Y., 124 AD3d 1013, 1014 [2015]). "In light of Family Court's superior position to evaluate witness credibility and make factual findings, the court's determination will not be disturbed if supported by a sound and substantial basis in the record" (Matter of Christina E. v Clifford F., 200 AD3d 1111, 1112 [2021] [internal quotation [*4]marks and citations omitted]).
The record reflects that the mother has been the primary caretaker of the child since birth, notwithstanding her school and work commitments. The mother testified that co-parenting with the father is not possible because he will use anything that she loves to make her life miserable. She expressed concern for her safety due to his lack of boundaries, as evidenced by his move to a residence located an eighth of a mile from her home and his cancellation of her cable service. The evidence demonstrated that the parties' relationship had been acrimonious and plagued by domestic violence. The father's commission of acts of domestic violence upon the mother in the presence of the child demonstrates an inability to put the child's needs first and calls into question his ability to facilitate a relationship between the mother and the child (see Matter of Darnell R. v Katie Q., 195 AD3d 1083, 1085 [2021]; Matter of Megan UU. v Phillip UU., 193 AD3d at 1290; Benedict v Benedict, 169 AD3d 1522, 1524 [2019]).
Under the circumstances, we find that a sound and substantial basis exists in the record to support Family Court's determination that it was in the child's best interests to award the mother sole legal and physical custody (see Matter of Darnell R. v Katie Q., 195 AD3d at 1085; Matter of Nicole V. v Jordan U., 192 AD3d 1355, 1358 [2021]).[FN2] As for the father's contentions regarding supervised visitation, we note that, a few days prior to the issuance of the order appealed from, the father was arrested and charged with criminal contempt in the second degree for violating the order of protection. He was thereafter convicted as charged and sentenced to 10 months in jail. The judgment of conviction was affirmed by this Court. Following the father's conviction, and by order entered October 22, 2018, Family Court suspended the father's visitation until he completes the first stage of a batterer's program. As a result of this order, the father's contentions regarding supervised visitation are moot.[FN3]
Garry, P.J., Clark and Aarons, JJ., concur.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: A report made against the father was indicated for inadequate guardianship.

Footnote 2: We note that the award of sole custody to the mother is supported by the attorney for the child and the psychologist who performed psychological evaluations of the parties at the direction of Family Court and testified at the fact-finding hearing.

Footnote 3: Although the October 22, 2018 order is not the subject of this appeal, the father's actions giving rise to the order should be considered in any future application for unsupervised visitation or custody. In suspending the father's visitation, Family Court considered the father's decision to forgo visitation with the child by remaining incarcerated rather than being released with an ankle bracelet. In addition, this Court was advised at oral argument that the father has not enrolled in a batterer's program.